**United States District Court**
**District of Minnesota**

| | |
|---|---|
| Richard H. Tholen, M.D., and Mary Jane Tholen,<br><br>       Plaintiffs,<br><br>v.<br><br>Assist America, Inc.,<br><br>       Defendant. | Case No. _____<br><br>**Jury Trial Demanded** |

## Complaint

1.      This case is about Assist America's false statements as part of its effort to profit from the leg amputation of one of its members.

2.      Assist America represents that it is in the business of providing global emergency medical services. These services include medical evacuation if a member does not receive appropriate care locally.

3.      In 2015, Dr. Richard H. Tholen was an Assist America member and entitled to Assist America's services.

4.      In April 2015, Dr. Tholen was in critical need of Assist America's services. Dr. Tholen suffered a horrific knee injury in a zip lining accident while in Mexico.

5.      Dr. Tholen and his wife, Mary Jane Tholen, called Assist America for help on April 19, 2015. But Assist America refused to evacuate him for proper care. As a result of Assist America's refusal to evacuate him, Dr. Tholen was denied proper medical care. Upon his return to the United States,

1

doctors determined that they would need to amputate his leg, a tragedy that would not have happened but for Assist America's refusal to provide the services it promised would be available to its members.

6.      Incredibly, Assist America has since sought to capitalize on Dr. Tholen's tragedy. In 2016, Assist America had published a "Case Study" about Dr. Tholen's request for help from Assist America. A copy of this publication is attached in Exhibit A.

7.      Assist America Vice President of Global Operations, Christopher "Kipp" Gibbs, authored the publication, with the assistance of Assist America's marketing department, within the scope of their employment.

8.      This Case Study contains false statements and misrepresentations that improperly blame Dr. and Mrs. Tholen for Dr. Tholen's amputation.

9.      Assist America's false statements and misrepresentations also try to make Assist America's response to Dr. Tholen's call appear better than it was.

10.     The tort of defamation reflects the basic concept of the essential dignity and worth of every human being. Assist America's false statements about the Tholens do not meet this standard. The Tholens bring their claim for defamation, as set forth below.

## The Parties

11.     Dr. and Mrs. Tholen are citizens and residents of the State of Minnesota.

12.     Assist America, Inc. ("Assist America") is a Delaware corporation with its principal place of business located at 202 Carnegie Center, Suite 302A, Princeton, New Jersey.

### Jurisdiction and Venue

13.     This Court has diversity jurisdiction under 28 U.S.C. §1332. Dr. and Mrs. Tholen, on one hand, and Assist America, on the other hand, are citizens of different states under §1332. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

14.     This Court has personal jurisdiction over Assist America under the Constitution of the United States and the laws of the State of Minnesota, including without limitation Minn. Stat. §543.19. Assist America conducts substantial and continuous business in, and specifically directed to, Minnesota. For instance, Assist America partners with HealthPartners, Delta Dental of Minnesota, and AMA Insurance, among other companies, to provide global medical emergency services to Minnesota residents. Assist America, thus, derives revenue from the business transactions with companies in Minnesota and from the services offered to individuals residing in Minnesota. Furthermore, the publication of the Case Study caused injury in Minnesota.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Assist America resides in this District under § 1391(c)(2).

## Factual Background

### Dr. Tholen is an accomplished surgeon in the Twin Cities

16.     Dr. Tholen is a board-certified, nationally recognized plastic surgeon. After he completed seven years of post-MD surgical training (General Surgery and Plastic and Reconstructive Surgery) at the Mayo Clinic in Rochester, Minnesota, Dr. Tholen started his practice at Minneapolis Plastic Surgery in 1987. Dr. Tholen is now a co-owner, senior partner, and president of Minneapolis Plastic Surgery, as he has over 29 years of experience providing high quality and innovative cosmetic surgery.

17.     Dr. Tholen's experience and reputation is well recognized. He was named a "Top Doctor" in Plastic Surgery by Minneapolis/St. Paul Magazine in 2014, 2015, 2016, and 2017. Dr. Tholen has also been included in the lists of "The Best Plastic Surgeons in America" and "Leading Physicians in the World." He is also an active member of the American Society for Aesthetic Plastic Surgery, American Society for Laser Medicine and Surgery, American Society of Bariatric Plastic Surgeons, American Society of Plastic Surgeons, and International Society of Aesthetic Plastic Surgery.

18.     Dr. Tholen is also a teacher and trainer. He has taught numerous physician-training courses nationally and internationally, including as an invited laser surgery instructor at Samsung Hospital in Seoul, Korea. Dr. Tholen has written and presented over 150 papers on a wide range of surgical techniques and aspects of plastic surgery.

4

19.     He also recognizes the importance of pro bono work. As a team leader for Operation Smile International and Children's Surgery International, Dr. Tholen has devoted his time and skill to perform reconstructive cleft lip and palate surgery for children on multiple humanitarian mission trips, including for children in Peru, Venezuela, Philippines, Romania, and Honduras.

20.     Outside of his practice, Dr. Tholen is married with six children.

**Dr. Tholen suffered a severe knee injury while in Mexico in April 2015, and requested help from Assist America.**

21.     Dr. Tholen suffered a severe knee injury on April 19, 2015, while participating in a zip-lining activity in Mexico. As he approached the final platform at the end of the course, Dr. Tholen collided with part of the braking/support apparatus (i.e., a pulley) and suffered an impact hyperextension dislocation of his right knee.

22.     Dr. Tholen sought medical assistance in Mazatlán, Mexico. But he did not receive proper medical care. The care the doctors provided Dr. Tholen would have been considered malpractice if performed in the United States. In particular, none of the doctors he saw in Mexico properly evaluated Dr. Tholen for a vascular injury. In addition, the first doctor Dr. Tholen saw placed a full circumferential cast on Dr. Tholen's injured leg. The Tholens later spoke by telephone with an orthopedic surgeon in the United States who advised them the cast needed to be removed immediately, and that they should return as soon as possible to the United States for additional evaluation and

treatment. The Tholens went to a local hospital in Mexico and had to insist that the doctor remove the cast. The first doctor the Tholens saw at the hospital disagreed that the cast should be removed. But the next doctor (Dr. Lopez) who treated Dr. Tholen agreed to remove the cast.

23.   As a long-time member of the American Medical Association and through multiple insurance policies through AMA Insurance, Dr. Tholen was an Assist America member in 2015. As an Assist America member, Dr. Tholen was entitled to the benefit of Assist America's global emergency medical services, including emergency medical evacuation, among other services, while traveling domestically or internationally 100 miles or more away from home.

24.   Dr. and Mrs. Tholen sought help from Assist America during this time of emergency and crisis.

25.   Assist America uses a hierarchy of employees to answer calls from its members based on the severity of the members' emergency.

26.   For medical emergencies, Assist America employs Level 4 and Level 5 medical coordinators to assist its members. But Assist America does not allow medical coordinators to determine whether a member is receiving appropriate care for his or her emergency. Instead, Assist America instructs the medical coordinators to gather information about the member's medical emergency from the treating doctor and the treating facility. The medical coordinators relay that information to Assist America's licensed doctors, referred to by Assist America as medical directors or clinical directors. In 2015,

Assist America had two medical/clinical directors, Dr. Tom Shaffrey and Dr. Doug Krohn.

27.     Once the medical coordinator receives the written or oral medical reports, Assist America instructs the medical coordinator to summarize the information and share it with Assist America's clinical director and chief medical consultant.

28.     Exhibit B is Assist America's case notes on Dr. Tholen's emergency.

29.     Dr. Tholen first contacted Assist America by email on April 19, 2015.

30.     The Tholens spoke with an Assist America medical coordinator, Cliff Sukhu, on April 19, 2015. Mrs. Tholen, along with Dr. Tholen, told Mr. Sukhu about the circumstances of the accident, the injuries Dr. Tholen sustained, and their concerns about the treatment Dr. Tholen had and was receiving. Dr. and Mrs. Tholen requested evacuation to the United States to get adequate medical care.

31.     Mr. Sukhu did not speak with a medical director at Assist America on April 19, 2015 about the Tholen's call. Yet he still refused to evacuate Dr. Tholen, representing that the Tholens were "at a very good hospital."

32.     The Tholens called Assist America again on April 20, 2015. Assist America again refused to evacuate Dr. Tholen.

33.    From April 19 through April 20, 2015, no Assist America medical director assessed whether Dr. Tholen was receiving adequate medical care at Hospital Marina Mazatlán.

34.    Because Assist America refused to help the Tholens, Dr. and Mrs. Tholen purchased first-available tickets for a commercial flight out of Mexico on April 21, 2015, and eventually landed in Minnesota in the early morning hours on April 22, 2015.

35.    The first time Assist America's medical directors (Dr. Shaffrey and Dr. Krohn) assessed Dr. Tholen's matter was on April 21, 2015—two days after Dr. Tholen sustained his injury.

36.    On April 21, 2015, Dr. Shaffrey and Dr. Krohn approved moving Dr. Tholen back to the United States.

37.    Dr. Shaffrey recommended that Dr. Tholen "should go back home to where providers 'really know what they are doing.'"

38.    Dr. Krohn reached his conclusion after speaking with Dr. Lopez who opined that Dr. Tholen had been stable since April 20, and that it was safe for Dr. Tholen to travel back to the United States. Following his conversation with Dr. Lopez, Dr. Krohn also expressed concern for Dr. Tholen's treatment and explained that Dr. Lopez "is hedging to get [Dr. Tholen] out of there," which left him "a little bit worried."

39.    Also on April 21, 2015, Assist America's Chief Medical Consultant, Joseph DiCorpo, approved moving Dr. Tholen back to the United States. Mr. DiCorpo advised that Assist America should either move Dr.

8

Tholen back to Minnesota or evacuate him to the closest port of entry to the United States, like Phoenix, San Diego, or Texas.

40.     At no time did any Assist America medical director talk with either Dr. or Mrs. Tholen.

41.     At no time did any Assist America medical director advise either Dr. or Mrs. Tholen against traveling to the United States.

42.     At no time did any Assist America medical director advise either Dr. or Mrs. Tholen that Dr. Tholen should have surgery in Mazatlán Mexico.

**Dr. Tholen underwent an above-the-knee amputation in May 2015 because of the delay of proper medical care immediately after his injury.**

43.     Dr. Tholen immediately saw an orthopedic surgeon and vascular surgeon upon returning to Minnesota on April 22, 2015. Dr. Tholen's injuries were assessed at Twin Cities Orthopedics and Fairview Southdale Hospital.

44.     Doctors ordered and performed an examination of the blood flow in Dr. Tholen's knee and leg using Doppler ultrasound

45.     Dr. Tholen was diagnosed with multiple ligamentous injuries, probable compartment syndrome, and likely intimal or arterial injury in his right leg upon initial assessment in Minnesota. Dr. Tholen's injuries required emergent fasciotomies and arterial bypass.

46.     Over the course of several weeks, Dr. Tholen endured multiple surgical procedures and significant pain and suffering in efforts at saving his leg.

47.    Ultimately, it was determined that Dr. Tholen's right leg could not be saved. On May 18, 2015, he underwent an above-knee amputation of his right leg.

**Assist America makes false statements and misrepresentations about its response to Dr. Tholen's tragedy and blames the Tholens for Dr. Tholen's amputation.**

48.    Before Dr. Tholen's amputation, Mrs. Tholen called Assist America to update them on Dr. Tholen's condition. She "wanted to tell them what had happened to her husband." After explaining the background, Mrs. Tholen informed Assist America that Dr. Tholen needed an amputation and expressed her frustration with Assist America's refusal to help Dr. Tholen when he was in Mexico. She asked Assist America to take responsibility and to say "I'm sorry." Assist America refused to do so. Mrs. Tholen ended her call to Assist America by begging that the next time a member calls Assist America for help, "go get them."

49.    Instead of taking responsibility, Assist America has published false statements and misrepresentations about its response to Dr. Tholen's request for help. Assist America's false statements and misrepresentations try to blame the Tholens for Dr. Tholen's amputation, and portray Assist America as having responded appropriately. Because neither is true, the Tholens set forth below their claim for defamation against Assist America.

## Count 1

## (Defamation)

50.   Dr. and Ms. Tholen repeat and reassert all allegations contained in Paragraphs 1-49 above.

51.   Assist America's response to Dr. Tholen's request for help was a private matter. And yet Assist America chose to publicize Dr. Tholen's case through the Case Study that it authored. Even worse, Assist America chose to make false and defamatory statements about the Tholens in the Case Study.

52.   The Case Study purports to describe Dr. Tholen's knee injury in Mexico and Assist America's response to the Tholen's evacuation request.

53.   The Case Study provides:

**Situation**

Assist America's services attached to an association membership
59-year-old male, injured in a zip lining accident in Cancun, Mexico

**Assistance Provided**

Assist America's Operation Center in Princeton, New Jersey, US received a call from a member who stated that he had been injured while zip lining. He explained that he had struck his leg on a pulley and sustained a high-energy fracture and dislocation. The member, a doctor himself, was transported to a local clinic for casting. Unfortunately, the clinician at the local clinic put on a full circumferential cast that was too restrictive, so the patient was moved to a local reputable hospital for re-evaluation. There, the treating doctor opened the cast to reduce the pressure, and based on his findings, recommended surgery.

At this time, the member contacted Assist America and insisted on traveling to his home in the Midwest to undergo surgery, expressing fear about receiving further care abroad. Assist America's medical director explained to the member that it was highly inadvisable to

travel given his condition. The safest option, he explained, would be to have the surgery performed locally at the reputable, well-equipped facility he was currently in. The member, however, declined and against the medical recommendations he was receiving from both Assist America and the local treating team, opted to make his own arrangements to travel home. Days later, Assist America was contacted by the member's wife who informed us that the patient's leg was ultimately amputated due to loss of circulation during travel.

Ex. A at 3.

54.     The Case Study is directed to Assist America's response to Dr. Tholen's injury in April 2015. The member referred to in the Case Study is Dr. Tholen, and Mrs. Tholen is "the member's wife."

55.     Readers of the Case Study aware of Dr. Tholen's situation would understand the Case Study as referring to the Tholens given the circumstances the Case Study describes, including a male member, "a doctor himself" who was "injured in a zip lining accident" in Mexico whose leg was ultimately amputated. The rarity of the combination of these facts alone identify this Case Study as addressing Dr. Tholen's situation in April 2015. Indeed, Dr. Tholen's zip-lining injury is the only zip-lining injury that Assist America has responded to that later involved an amputation.

56.     This Case Study was part of a publication for an industry publication. Assist America wrote this article for business development and marketing purposes. Assist America's Vice President of Global Operations, Mr. Gibbs, authored this article, with assistance from Assist America's marketing personnel.

57.     The Case Study was published in Assistance and Repatriation Review 2016 on July 26, 2016. The Assistance and Repatriation Review 2016 was a special review publication published along with the August 2016 issue of the International Travel & Health Insurance Journal ("ITIJ"). *See* https://s3-eu-west-1.amazonaws.com/itij17/itij-issues/itij_proof187.pdf (last accessed on July 20, 2018) *e.g.* at p. 4 ("this year's *Assistance & Repatriation Review* (out with this [August 2016] issue of *ITIJ*)"). ITIJ has "a readership of over 20,000 key individuals" according to its publisher. *See* https://www.itij.com/advertise (last accessed on July 20, 2018).

58.     The Case Study includes many false and defamatory statements.

59.     For example, Assist America stated in the Case Study that "the treating doctor opened the cast to reduce the pressure, and based on his finding, recommended surgery." This statement is false.

60.     Dr. Lopez, the treating doctor, did not recommend surgery after removing the cast; instead, he recommended observation for 24-48 hours.

61.     Assist America also stated that "Assist America's medical director explained to the member that it was highly inadvisable to travel given his condition. The safest option, he explained, would be to have the surgery performed locally at the reputable, well-equipped facility he was currently in." These statements are false.

62.     At no time did an Assist America medical director ever speak with Dr. Tholen or Mrs. Tholen.

13

63. No Assist America medical director ever advised the Tholens against travel. To the contrary, Assist America's medical directors and chief medical coordinator all authorized Dr. Tholen's travel to the United States on April 21, 2015.

64. No Assist America medical director advised the Tholens to have surgery locally either.

65. No Assist America medical director represented to the Tholens that Hospital Marina Mazatlán was a "reputable, well-equipped facility." To the contrary, the hospital opened only several months earlier; it did not have full capabilities of a hospital, such as MRI; and Assist America did not know the full range of capabilities that the hospital offered during its response to the Tholen's request for help. Assist America has admitted that it had no basis to call Hospital Marina Mazatlán a reputable facility at the time of Dr. Tholen's call for help. And no Assist America medical director ever investigated whether Hospital Marina Mazatlán was well equipped.

66. Assist America's statement that "The member, however, declined and against the medical recommendations he was receiving from both Assist America and the local treating team, opted to make his own arrangements to travel home" is false.

67. Assist America did not provide any medical recommendations to Dr. Tholen. Nor was Assist America even aware of what surgery Dr. Tholen needed in April 2015.

68.    Assist America's statement that "Days later, Assist America was contacted by the member's wife who informed us that the patient's leg was ultimately amputated due to loss of circulation during travel" is false.

69.    Assist America's recording of Mrs. Tholen's call to Assist America on May 7, 2015 confirms the falsity of Assist America's statement in paragraph 68. Assist America's case notes also confirm the falsity of Assist America's statement in paragraph 68.

70.    Mrs. Tholen did *not* say that Dr. Tholen's amputation was due to loss of circulation during travel, or anything remotely similar to that statement.

71.    Assist America's false and defamatory statements have upset, disturbed, and injured the Tholens. These false and defamatory statements paint the Tholens in a negative manner by falsely implying that Dr. Tholen's loss of his leg was based on their decision and actions.

72.    To make the matter worse, Assist America made these false and defamatory statements in connection with its marketing department. Assist America included these false and defamatory statements to paint Assist America in a positive light, when in fact its response to Dr. Tholen disregarded his health and safety.

73.    Assist America (through its officer and employees) made the false statements intentionally and with knowledge of their falsity or in reckless disregard of the truth or falsity of them. Assist America made the false statements with deliberate disregard for the impact of the false statements on the Tholens or their rights.

15

74.     Dr. and Mrs. Tholen bring this claim for the full measure of damages they have suffered and continue to suffer because of Assist America's defamation, including injury to reputation, mental distress, humiliation, and embarrassment. Dr. and Mrs. Tholen also request punitive damages from Assist America.

### Demand for Jury Trial

Dr. and Mrs. Tholen demand a trial by jury in this action pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38.1.

### Request for Relief

Dr. and Mrs. Richard Tholen request the following relief:

1.     Entry of judgment in favor of Dr. and Mrs. Tholen and against Assist America on all counts in this Complaint;

2.     An award of damages, including interest, in an amount to be determined at trial, but at least in an amount that exceeds the jurisdictional limit of $75,000 in this Court;

3.     An award of costs, expenses, attorney's fees, and disbursements;

4.     An award of punitive damages; and,

5.     Such other and further relief as is just and proper.

Dated: July 24, 2018                    Respectfully Submitted,

                                        By: /s/ Patrick M. Arenz

                                        **ROBINS KAPLAN LLP**
                                        Ronald J. Schutz (Bar No. 0130849)
                                        Patrick M. Arenz (Bar No. 0386537)
                                        Brenda L. Joly (Bar No. 0386791)
                                        Emily E. Niles (Bar No. 0396631)
                                        800 LaSalle Avenue, Suite 2800
                                        Minneapolis, Minnesota 55402
                                        Telephone: (612) 349-8500
                                        Facsimile: (612) 339-4181
                                        RSchutz@robinskaplan.com
                                        PArenz@robinskaplan.com
                                        BJoly@robinskaplan.com
                                        ENiles@robinskaplan.com

                                        **Counsel for Plaintiffs Richard H. Tholen
                                        and Mary Jane Tholen**

89126729.2

17