## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Richard H. Tholen, M.D., and Mary Jane
Tholen,

                Plaintiffs,

v.

Assist America, Inc.,

                Defendant.

Civil No. 18-2137 (DWF/TNL)


**MEMORANDUM
OPINION AND ORDER**

---

Patrick M. Arenz, Esq., Ronald J. Schutz, Esq., Brenda L. Joly, Esq., and Emily E. Niles, Esq., Robins Kaplan LLP, counsel for Plaintiffs.

Alexander M. Baggio, Esq., and Mark T. Berhow, Esq., Hinshaw & Culbertson LLP, counsel for Defendant.

---

## INTRODUCTION

In July 2018, Plaintiffs Richard H. Tholen, M.D. ("Dr. Tholen") and Mary Jane

Tholen ("Mrs. Tholen") (collectively, the "Tholens"), sued Defendant Assist America,

Inc. ("Assist America") for alleged defamation arising from Assist America's publication

of marketing material that detailed an accident that led to the amputation of Dr. Tholen's

leg.[1]  This matter is before the Court on Assist America's motion for summary judgment.

(Doc. No. 52.)  For the reasons set forth below, the Court denies the motion.[2]

## BACKGROUND

The factual background for the above-entitled matter is clearly and precisely set

forth in previous Orders and is incorporated by reference here.  (*See* January 2019 Order;

*see also Tholen I* at Doc. No. 266.)  The Court notes particular facts relevant to this Order

below.[3]

Dr. Tholen is a board-certified, nationally recognized plastic surgeon.  (Doc.

Nos. 56 ("Baggio Decl.") ¶ 2; 57 ("Dr. Tholen 2018 Dep.") at 33-37; 57-5 ("Dr. Tholen

2020 Dep.") at 65.)  Assist America is a membership-based organization that provides

global emergency medical services, including medical evacuation, if a member is more

than 100 miles from home and does not receive adequate care locally.  (Baggio Decl. ¶ 2;

Doc. No. 57-1 ("Agreement") at 2, 22; Doc. No. 64 ("Arenz Decl.") ¶ 2, Doc. No. 64-1

---

[1]    In August 2017, Dr. Tholen also sued Assist America for negligence and breach-of contract.  *Tholen v. Assist Am., Inc.*, Case No. 17-cv-3919-DWF-TNL (D. Minn.) (*"Tholen I"*).  The parties have agreed that the discovery conducted in *Tholen I* may be incorporated and relied on for purposes of this matter.  (Doc. No. 42 at 1.)

[2]    The Court previously dismissed this matter upon finding that the Tholens failed to state a proper claim for defamation when the allegedly defamatory material did not refer to them explicitly or by implication.  (*See* Doc. No. 15 ("January 2019 Order").)  The Eighth Circuit subsequently reversed this Court's decision and remanded the matter for further proceedings.  *Tholen v. Assist Am., Inc.*, 970 F.3d 979, 984-5 (8th Cir. 2020).  Assist America moved for summary judgment on January 15, 2021.  (Motion.)

[3]    The Court also supplements relevant facts as needed.  Moreover, where facts are disputed, the Court construes them in the light most favorable to the Tholens as the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).

("Gibbs Dep.") at 19-20.).  The Tholens were Assist America Members in 2015.  (Dr. Tholen 2018 Dep. at 23-24, 26; Baggio Decl. ¶ 2, Doc. No. 57-2 ("Assist America Case Notes") at 4.)

On April 19, 2015, while vacationing in Mazatlán, Mexico, Dr. Tholen suffered a severe knee injury in a zip lining accident.  (Dr. Tholen 2018 Dep. at 204-208; Assist America Case Notes at 27.)  Dr. Tholen received immediate medical care at a local clinic which included the placement of a hard cast on his leg.  (Assist America Case Notes at 27).  Dr. Tholen's leg was not assessed for vascular injury before casting.  (Arenz Decl. ¶ 6, Doc. No. 64-5 ("Jackson Rep.") ¶ 13.)

The same day, the Tholens contacted an orthopedic surgeon in the United States who advised them to have the cast removed and to return to the Unites States as soon as possible for evaluation and treatment.[4]  (Dr. Tholen 2020 Dep. at 42-3; Assist America Case Notes at 27.)  Heeding this advice, the Tholens visited a second medical facility in Mexico to have the cast removed.  (Dr. Tholen 2020 Dep. at 44; Assist America Case Notes at 27.)  The first doctor they saw at that facility refused to remove the cast.  (Dr. Tholen 2020 Dep. at 44).  The doctor who agreed to remove the cast advised that Dr. Tholen's leg should be observed for 24-48 hours but did not recommend surgery.  (Gibbs Dep. at 29, 372, 389; Dr. Tholen 2020 Dep. at 44-45; Assist America Case Notes at 20.)

While at the second medical facility, Dr. Tholen e-mailed and called Assist America to request medical evacuation.  (Assist America Case Notes at 25-27.)  He

---

[4]     The Tholens contend that the care Dr. Tholen received at the clinic was so poor that it would constitute malpractice in the United States.  (Jackson Rep. ¶ 133.)

explained that he was in pain, his toes were numb, and he had been advised by a surgeon in the United States to return home for treatment (Assist America Case Notes at 27.)  A medical coordinator at Assist America returned Dr. Tholen's email and call; however, Assist America did not provide immediate evacuation.  (Assist America Case Notes at 25-26.)  Just after midnight on April 20, the Tholens called Assist America again to request evacuation.  (*See id.* at 20-24; *see also* Baggio Decl. ¶ 2, Ex. 4 ("Audio Recording").)  The medical coordinator explained that Assist America did not provide evacuation if a patient was receiving appropriate care and declined to move Dr. Tholen until he received additional information.  (Assist America Case Notes at 24; *see also* Audio Recording.)  Assist America's decision was not based on consultation with its medical directors.  (Gibbs. Dep. at 33-38, 320, 334-35; *see also* Assist America Case Notes at 14-21.)

Assist America did not consult with its medical team until April 21.  (*See* Assist America Case Notes at 12-15.)  Upon consultation, two medical directors and Assist America's Chief Medical Consultant all expressed concern with the care Dr. Tholen was receiving and supported transportation back to the United States.  (*Id.* at 12; Arenz Decl. ¶ 7, Doc. No. 64-6 at 8.)  No Assist America medical director advised Dr. Tholen against travel or told him that he should have surgery in Mexico.  (Gibbs. Dep. at 375-76.)

Rather than wait for Assist America, the Tholens made their own arrangements to fly home commercially.  (Doc. No. 57-4 ("Mrs. Tholen 2018 Dep.") at 189-192; Arenz Decl. ¶ 4, Doc. No. 64-3 ("Mrs. Tholen 2020 Dep.") at 43-44; Assist America Case Notes

at 20.)  The Tholens returned home early on April 22.  (Mrs. Tholen 2018 Dep. at 191.)

Later that day, doctors confirmed that Dr. Tholen had suffered a vascular injury.

(Jackson Report ¶ 10.)  Dr. Tholen's injury ultimately required an above-knee amputation

of his right leg.  (Doc. No. 1 ("Compl.") ¶¶ 44-47.)

A week before the amputation, Mrs. Tholen called Assist America to notify them

that Dr. Tholen was scheduled to have his leg amputated and asked Assist America to

apologize for its actions.  (Assist America Case Notes at 5; *see also Tholen I* Doc.

No. 217 ¶ 40, Ex. 81, Audio File AAI00104 ("Audio Recording II").)  She advised Assist

America that the next time a member needed assistance, Assist America should "go get

them."  (Assist America Case Notes at 5.)

A year later, Assist America published a case study based on Dr. Tholen's

accident in its "Assistance and Repatriation Review 2016," a special edition of its

International Travel & Health Insurance Journal.  (Baggio Decl. ¶ 2, Doc. No. 56-1 at 13

("Case Study").)

The Case Study provides:

**Situation**

Assist America's services attached to an association membership.
59-year-old male, injured in a zip lining accident in Cancun, Mexico.

**Assistance Provided**

Assist America's Operations Center in Princeton, New Jersey, US received
a call from a member who stated that he had been injured while zip lining.
He explained that he had struck his leg on a pulley and sustained a
high-energy fracture and dislocation.  The member, a doctor himself, was
transported to a local clinic for casting.  Unfortunately, the clinician at the
local clinic put on a full circumferential cast that was too restrictive, so the

patient was moved to a local reputable hospital for re-evaluation.  There, the treating doctor opened the cast to reduce the pressure, and based on his findings, recommended surgery.

At this time, the member contacted Assist America and insisted on traveling to his home in the Midwest to undergo surgery, expressing fear about receiving further care abroad.  Assist America's medical director explained to the member that it was highly inadvisable to travel given his condition.  The safest option, he explained, would be to have the surgery performed locally at the reputable, well-equipped facility he was currently in.  The member, however, declined and against the medical recommendations he was receiving from both Assist America and the local treating team, opted to make his own arrangements to travel home.  Days later, Assist America was contacted by the member's wife who informed us that the patient's leg was ultimately amputated due to loss of circulation during travel.

**Sound Advice**

There is a saying that time heals all wounds.  Perhaps not always true, but time is often necessary for a patient to be in a safe position to travel.  Moving a patient before he or she is ready carries risks and the decision should not be taken lightly. It is important that a patient and their family take a step back to look at the situation objectively, removing their emotions from the decision-making process. While it may be instinctual to want to get back to the comforts of home as quickly as possible, this may not be what's best for the patient.  It is much more likely that there will be a favourable [sic] outcome when the decision of whether or not to transport the patient is one based on sound medical advice and not just human emotion.

(Case Study).  The author of the Case Study admitted that it was based on the Tholens'

experience (Gibbs Dep. at 379 ("I used Dr. Tholen's case for this case study, I did.")),

and that it was intended to illustrate what can happen in a scenario when one acts in haste

(*Id.* at 67).

On July 24, 2018, the Tholens sued Assist America for defamation.  (Compl.

¶¶ 30-36.)  The Tholens argue that the Case Study contains false statements and

misrepresentations that have upset, disturbed, and injured them.  (Dr. Tholen 2020 Dep.

at 11, 14, 22; Arenz Decl. ¶ 3, Doc. No. 64-2 ("Dr. Tholen 2020 Dep. II") at 79-85; Mrs.

Tholen 2020 Dep. II at 9, 31-37.)  The alleged false statements include:

- "[T]he treating doctor opened the cast to reduce the pressure, and based on his findings, recommended surgery."  ("Statement One.")

- "Assist America's medical director explained to the member that it was highly inadvisable to travel given his condition."  ("Statement Two.")

- "The safest option, [the medical director] explained, would be to have the surgery performed locally at the reputable, well-equipped facility [Dr. Tholen] was currently in."  ("Statement Three.")

- "The member, however, declined and against the medical recommendations he was receiving from both Assist America and the local treating team, opted to make his own arrangements to travel home."  ("Statement Four.")

- "Days later, Assist America was contacted by the member's wife who informed us that the patient's leg was ultimately amputated due to loss of circulation during travel."  ("Statement Five.")

(Compl. ¶¶ 59 ("Statement One"), 61 ("Statement Two") and ("Statement Three"), 66

("Statement Four"), 68 ("Statement Five"), (collectively, "Statements").)

The Tholens contend that the Statements paint them in a negative manner by

falsely implying that Dr. Tholen's loss of his leg was based on their decision and actions.

(*Id.* ¶ 71.)  They seek damages for injury to reputation, mental distress, humiliation, and

embarrassment.  (*Id.* ¶ 74.)  The Tholens also request punitive damages.  (*Id.*)

## DISCUSSION

### I.   Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.   Defamation

To prevail on their claim for defamation, the Tholens must prove that Assist America made: (1) a false and defamatory statement; (2) in an unprivileged publication to a third party; (3) that harmed their reputation(s). *Maethner v. Someplace Safe. Inc.,* 929 N.W. 2d 868, 873 (Minn. 2019) (citing *Weinberger v. Maplewood Rev.*, 668 N.W.2d 667, 673 (Minn. 2003)).

"Truth is a complete defense to a defamation claim." *Maethner*, 929 N.W.2d at 873 n.2 (citing *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980)).

8

"If [a] statement is true in substance, inaccuracies of expression or detail are immaterial."
*Jadwin v. Minneapolis Star & Trib. Co.*, 390 N.W.2d 437, 441 (Minn. Ct. App. 1986).
Indeed, "[a] statement is substantially accurate if its gist or sting is true, that is, if it
produces the same effect on the mind of the recipient which the precise truth would have
produced." *Id.* (quoting *Williams v. WCAU-TV*, 555 F. Supp. 198, 202 (E.D. Pa. 1983)).
"[T]he truth or falsity of a statement is inherently within the province of the jury."
*Lewis v. Equitable Life. Assur. Soc'y*, 389 N.W. 2d 876, 889 (Minn. 1986).

"Words are defamatory when they tend to injure a plaintiff's reputation and
expose the plaintiff to public hatred, contempt, ridicule, or degradation." *Church of
Scientology v. Minn. State Med. Ass'n Found.*, 264 N.W. 2d 152, 155 (Minn. 1978).
"Whether a defamatory meaning is conveyed is dependent upon how an ordinary person
understands the language used in the light of surrounding circumstances." *Harman v.
Heartland Food Co.*, 614 N.W.2d 236, 240 (Minn. Ct. App. 2000) (internal citation and
quotation marks omitted). "If words are reasonably capable of carrying a defamatory
meaning, the determination as to whether the communication was in fact defamatory is
for the jury." *Michaelis v. CBS, Inc.*, 119 F.3d 697, 700 (8th Cir. 1997).

Moreover, the allegedly defamatory statement "must refer to some ascertained or
ascertainable person and that person must be the plaintiff." *MSK EyEs Ltd. v. Wells
Fargo Bank, Nat'l Ass'n*, 546 F.3d 533, 542 (8th Cir. 2008) (applying Minnesota law)
"'A plaintiff does not have to be specifically named in the defamatory statement so long
as a reader by fair implication would understand the statement to be directed at the
plaintiff.'" *Tholen*, 970 F.3d at 983 (quoting *Glenn v. Daddy Rocks, Inc.*, 171 F. Supp.

2d 943, 948 (D. Minn. 2001)).  "[W]hether an allegedly defamatory statement concerns

that plaintiff is generally a question of fact for the jury."  *Maethner v. Someplace Safe,*

*Inc.*, 907 N.W. 2d 665, 670 (Minn. Ct. App. 2018) (citing *Covey v. Detroit Lakes*

*Printing Co.*, 490 N.W. 2d 138, 143 (Minn. Ct. App. 1992)), *rev'd in part on other*

*grounds*, 929 N.W.2d 868 (Minn. 2019.)

A plaintiff claiming defamation typically must establish harm to reputation;

emotional-harm damages are insufficient in themselves to make the matter actionable.

*Maethner*, 829 N.W.2d at 874.  In cases of defamation per se, however, harm to

reputation may be presumed.  *Id.* at 875; *see also Richie v. Paramount Pictures Corp.*,

544 N.W. 2d 21, 25 (Minn. 1996); *Chafoulias v. Peterson*, 668 N.W.2d 642, 654 (Minn.

2003).  Statements considered defamatory per se include "false accusations of

committing a crime and false statements about a person's business, trade, or professional

conduct."  *Id*. (citing *Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661

(Minn. 1987)).  "Courts allow presumed damages because statements that are defamatory

per se are 'virtually certain to cause serious injury to reputation, and that this kind of

injury is extremely difficult to prove.'"  *Id.*  (citing *Carey v. Piphus*, 435 U.S. 247, 262

(1978)).

Still, given the constitutional protections of the First Amendment, "courts cannot

offer recourse for injury to reputation at the cost of chilling speech on matters of public

concern . . . which is entitled to special protection."  *Maethner*, 829 N.W.2d at 875

(internal quotation marks and citation omitted).  Therefore, to strike a legal balance

between reputational rights and free speech protections on matters of public concern, a

private plaintiff may not recover presumed damages absent a showing of actual malice. (*Id.* at 875-76, 878-89.)

Actual malice is "a term of art" that applies to a "defendant [who] acted with knowledge that [a] publication was false or with reckless disregard of whether it was false or not." *Chafoulias*, 668 N.W.2d at 654. "The defendant need not have 'acted with ill will or spite,' and 'reckless disregard' simply 'requires that a defendant make a statement while subjectively believing that the statement is probably false.'" *Tholen*, 970 F.3d at 984 (quoting *Chafoulias*, 668 N.W.2d at 654-55).

Minnesota law also permits punitive damages "upon clear and convincing evidence" that a defendant acted with deliberate disregard for the rights or safety of others. Minn. Stat. § 549.20(1)(a). Deliberate disregard is shown when the actor "has knowledge of facts or intentionally disregards facts that create a high degree of probability of injury to the rights or safety of others," yet deliberately proceeds "to act in conscious or intentional disregard" of this likelihood or "to act with indifference" to it. *Id.*, subd. 1(b).

Assist America argues that the Tholens' defamation claim fails because: (1) the Case Study does not identify the Tholens; (2) the statements in the Case Study are substantially truthful and not defamatory; and (3) the Tholens fail to present evidence showing reputational harm and presumed damages do not apply. Assist America also argues that the Tholens' request for punitive damages fails. The Tholens contend that a myriad of disputes over genuine issues of material fact preclude summary judgment.

III.   **The Tholens' Identity in the Case Study**

Assist America first contends that the Tholens' defamation claim fails because

"the Case Study does not provide information that explicitly or implicitly identifies [the

Tholens] as being the focus of the alleged defamatory statements." (Doc. No. 54 ("Def.

Memo.") at 12.) Assist America argues further that because the Case Study does not

name the Tholens and because it omitted or altered identifying details, only those readers

already aware of the Tholens' situation could identify them. (*Id.*; *see also* Doc. No. 65

("Reply") at 2-4.) Assist America contends that because the Tholens identify no person

who read or discussed the Case Study, the Tholens cannot show that the Case Study

concerns them explicitly or by implication. (Def. Memo. at 12; Reply at 4.)

The Tholens argue that the unique facts and circumstances in the Case Study

clearly refer to them by implication and that any counterargument is negated by Assist

America's own admission that it based the Case Study on the Tholens' experience. (Doc.

No. 63 ("Pl. Opp.") at 9-12.) The Tholens also contend that any issue of identification is

a question of fact for the jury. (*Id.* at 13.) The Court agrees.

While Assist America did not name the Tholens and omitted or altered some

identifying details, the Case Study's author admitted that it was about the Tholens.

(Gibbs. Dep. at 366, 373.) Moreover, the Court finds that the circumstances described in

the Case Study's factual background—specifically, a married, male, member Doctor of

Assist America whose leg was amputated after a zip-lining accident in Mexico—are

sufficiently unique to create a triable issue as to whether the Case Study implicates the

Tholens.  Indeed, Assist America concedes that the Tholens' case was the only one that resulted in a leg amputation.  (*Id.* at 54.)

Given that Dr. Tholen is a nationally known surgeon and Assist America is a membership-based organization that provides emergency medical services, it is plausible that those who read the Case Study included members of the medical community who could identify the Tholens without performing additional inquiry.  *See Glenn v. Daddy Rocks, Inc.*, 171 F. Supp. 2d 943, 948 (D. Minn. 2001) (noting that defamation claim fails unless reader is able to identify plaintiff without performing additional inquiries).  "The test [for identification in defamation cases] is neither the intent of the author nor the apprehension of the plaintiff that the article might disclose the identity of the plaintiff, but rather the reasonable understanding of the recipient of the communication."  *Ruzicka v. Conde Nast Publ'ns*, 999 F.2d 1319, 1322 (8th Cir. 1993).  In the Eighth Circuit's own words, "the universe of identifiable subjects who fit all of these unique facts is practically limited to one."  *Tholen*, 970 F.3d at 984  Consequently, it is for the jury to determine whether the likely recipients of the Case Study included those able to identify the Tholens.

In short, the Court finds that the Tholens have presented sufficient evidence to create a genuine dispute of material fact over whether a reasonable reader could identify them as the subjects of the Case study.  Thus, the Court declines to grant summary judgment on this basis.[5]

---

[5]     The Court recognizes that it granted Assist America's motion to dismiss after finding that the Case Study did not refer to the Tholens explicitly or by implication.  (*See*

IV.    **Truthfulness and Defamatory Nature of Statements**

Assist America next argues that the Tholens' defamation claim fails because the Statements in the Case Study are "substantially true" and not defamatory.  (Def. Memo. at 12-18; *see also* Reply at 4-6.)  Assist America asserts that the Statements "represent slight variations" to protect the Tholens' identities "while still providing the reader the same helpful information on premature transport."  (Reply at 5.)  Assist America further argues that the variations are substantially accurate because they produce the same effect on the reader as the precise truth would produce.  (Def. Memo. 17; Reply at 4.)  The Tholens contend that the record confirms their allegations that the Case Study contains false and defamatory statements, or at least shows that the issue cannot be resolved on summary judgment.  (Pl. Opp. at 12-22.)

The Court finds sufficient evidence to create a genuine issue of material fact as to whether one or more of the Statements in the Case Study is false and defamatory.[6]  For example, Statement One provides that the treating physician in Mexico "opened [Dr. Tholen's] cast to reduce the pressure, and based on his findings, recommended surgery." (Statement 1.)  The record reflects that the treating physician did not recommend surgery.

---

January 2019 Order.)  Because of the Eighth Circuit's decision and upon facts disclosed during discovery, including Assist America's admissions that the Tholens' experience was the basis of the Case Study and that the Tholens' case was the only one that resulted in a leg amputation, the Court finds sufficient evidence to create genuine dispute of material fact over whether the Case Study implicates the Tholens.

[6]    The Tholens rightly point out that the Case Study need contain only one false and defamatory statement to proceed beyond summary judgment.  (*Id.* at 15 (citing *Gadach v. Benton Cnty. Co-op. Ass'n,* 53 N.W.2d 230, 233-34 (Minn. 1952)).)

(Gibbs Dep. at 372, 389; Dr. Tholen 2020 Dep. at 44-45; Assist America Case Notes at 20.)  Assist America claims that this Statement is substantially true because Dr. Tholen was receiving medical care from a treating doctor "even if [he] had not recommended surgery."  (Def. Memo. at 15-16.)  Assist America also contends that the statement is not defamatory to the Tholens because the "alleged inaccuracy" pertains to the actions of Dr. Tholen's treating physician.  (*Id.* at 15-16.)

Statement Two states that "Assist America's medical director explained to the member that it was highly inadvisable to travel given his condition."  (Statement 2.)  The record reflects that no Assist Medical director ever spoke with the Tholens or advised against travel.  (Gibbs. Dep. at 46-47, 389; *see also* Assist America Case Notes.)  To the contrary, two of Assist America's medical directors approved travel for Dr. Tholen.  (Assist America Case Notes at 11-12.)  Assist America claims that this statement is substantially true because while the Tholens did not speak to a medical director, they did speak to a medical coordinator.  (Def. Memo. at 17.)  Assist America concedes that a medical coordinator is different from a medical director but argues that "the effect on the reader is the same given the context."  (*Id.*)  Assist America also contends that the statement is not defamatory to the Tholens because the "alleged inaccuracies" concern information provided by the medical coordinator.  (*Id.* at 15-16.)

Statement Three provides that "the safest option, [the medical director] explained, would be to have the surgery performed locally at the reputable, well-equipped facility [Dr. Tholen] was currently in."  (Statement Three.)  As discussed above, the record reflects that the Tholens never spoke with a medical director.  (Gibbs. Dep. at 46-47, 389;

*see also* Assist America Case Notes.)  Moreover, no representative of Assist America

recommended that Dr. Tholen have surgery in Mexico.  (Gibbs Dep. at 375; *see also*

Assist America Case Notes.)  Additionally, there is no support that the hospital Dr.

Tholen was treated at was a reputable, well-equipped facility.  (Gibbs. Dep. at 49-50,

377-78, 381-82.)  Assist America argues Statement Three is substantially true because it

shows that its personnel were aware of Dr. Tholen's condition and the treatment he was

receiving.  (Def. Memo. at 17.)  It also contends that the Statement is not defamatory to

the Tholens because "the alleged inaccuracies" again pertain to information provided by

the medical coordinator.[7]  (*Id.* at 16-17.)  Assist America further argues that whether the

medical facility was reputable and well-equipped is a matter of opinion and therefore not

actionable for a defamation claim.  (*Id.* at 17.)

Statement Four states that "[t]he member, however, declined and against the

medical recommendations he was receiving from both Assist America and the local

treating team, opted to make his own arrangements to travel home."  ("Statement Four.")

As discussed above, no Assist America medical director advised Dr. Tholen not to travel.

(Gibbs. Dep. at 46-47, 389; *see also* Assist America Case Notes at 11-12 (approving

travel).)  The record similarly reflects that Dr. Tholen's treating physician in Mexico

agreed that it was safe for Dr. Tholen to travel.  (Assist America Case Notes at 11.)

Assist America argues that because Assist America and Dr. Tholen's treating physician

were in communication when Dr. Tholen decided to self-transport home, the Statement is

---

[7]    Assist America conflates Statements Two and Three in its argument for summary
judgment.  (*See* Def. Memo. at 16-17.)

substantially accurate because it has a similar effect on a reader whether or not a specific

medical recommendation was made.  (*Id.* at 17.)  Assist America also contends that the

Statement is not defamatory.  (*Id.* at 17.)  It contends that "[the Tholens'] specific focus

on specific details to bring a defamation claim ignores the larger reality that [the Tholens]

repeatedly sought transfer to Minnesota."  (*Id.* at 18.)

Statement Five provides, "[d]ays later, Assist America was contacted by the

member's wife who informed us that the patient's leg was ultimately amputated due to

loss of circulation during travel."  ("Statement Five.")  The record reflects that Mrs.

Tholen called Assist America to inform it that Dr. Tholen was scheduled to have his leg

amputated, to ask for an apology, and to advise Assist America to help others in the

future.  (Assist America Case Notes at 5; *see also* Audio Recording II.)  The author of the

Case Study also admits that Mrs. Tholen never stated that Dr. Tholen's leg was

amputated due to loss of circulation during travel.  (Gibbs. Dep. at 385-386.)  Assist

America appears to concede that Statement Five is untrue (Def. Memo. at 18) but argues

that the Statement is not defamatory because it "merely illustrates to a reader about a

potential risk that may occur when traveling after suffering an accident" and "does not

impart blame or responsibility on Dr. Tholen for the loss of his leg."  (*Id.*)

The record clearly supports the Tholens' allegations; however, it is for the jury to

decide whether it is convinced by Assist America's argument that any inaccuracy is

immaterial.  *Lewis*, 389 N.W.2d at 889 ("[T]he truth or falsity of a statement is inherently

within the province of the jury.").  The Court also finds that the Statements, individually

and collectively, could reasonably be understood to expose the Tholens to ill opinion,

ridicule, and contempt by conveying that Dr. Tholen's leg amputation was caused by the

Tholens' poor judgment and unwise "human emotion" that ignored "sound medical

advice."[8]  (*See* Case Study.)  Therefore, the question as to whether the Statements are in

fact defamatory is also for the jury.[9]  *Michaels v. CBS, Inc.*, 119 F.3d 697, 700 (8th Cir.

1997) ("If words are reasonably capable of carrying a defamatory meaning, the

determination as to whether the communication was in fact defamatory is for the jury.");

*see also Utech*, 324 N.W.2d at 654.

In short, because the parties dispute the truthfulness of the Statements and because

a jury could reasonably understand the Statements to carry a defamatory meaning, the

Court declines to grant summary judgment on this basis.

## V.     Damages

Assist America also argues that the Tholens' defamation claim fails because they

cannot show actual damage to their reputations and because damage to their reputations

---

[8]     As a nationally recognized medical doctor, the implication that Dr. Tholen lost his leg because he exercised poor judgment and relied on emotion instead of sound medical advice is clearly defamatory.  It is for a jury to determine whether that meaning was the one actually conveyed.  *Utech v. Shopko Dep't Store*, 324 N.W.2d 652, 654 (Minn. 1982) (reversing summary judgment when words were reasonably susceptible of a defamatory meaning).

[9]     Assist America's argument that some Statements are not defamatory because they pertain to actors other than the Tholens is misplaced as each Statement could reasonably be understood to support the overall implication that Dr. Tholen lost his leg because the Tholens exercised poor judgment, acted in haste, and ignored sound medical advice. *Harman v. Heartland Food Co.*, 614 N.W.2d 236, 240 (Minn. Ct. App. 2000) ("In deciding whether words bear a non-actionable meaning, the words must be construed as a whole without taking any word or phrase out of context or placing undue emphasis upon any one part." (internal quotation marks and citation omitted)).

cannot be presumed.  (Def. Memo. at 18-23.)  Assist America contends that the Tholens

fail to present any actual evidence of reputational harm and the Statements are not

defamatory per se because they do not claim or imply that the Tholens committed a crime

or comment on their business, trade, or professional conduct.[10]  (*Id.* at 19-21; Reply

at 8-9.)  Even if the Statements were defamatory per se, Assist America argues that the

Tholens' defamation claim still fails because the Case Study addressed a public concern

and because the Tholens cannot show that Assist America acted with actual malice.  (Def.

Memo. at 21-23; Reply at 9-10.)

The Tholens argue that a showing of actual damages is unnecessary because the

harm to their reputations is presumed through the libelous content of the Statements.  (Pl.

Opp. at 22-30.)[11]  They contend that limiting defamation per se to false accusations of

committing a crime and false statements about a person's business, trade, or professional

conduct wrongfully ignores the difference between slander and libel.  (*Id.* at 23-26.)

Even if limited to those categories, the Tholens argue that the Statements are still

defamatory per se because they reflect poorly on Dr. Tholen's ability to perform his

profession as a medical doctor.  (*Id.* at 26-27.)  The Tholens further argue that presumed

---

[10]    With respect to professional conduct, Assist America asserts that "merely being a
doctor who receives treatment does not transform any personal medical decision Dr.
Tholen [made] into a comment on his ability as a plastic surgeon."  (Def. Memo.
at 20-21.)

[11]    The Tholens also assert that they have presented sufficient evidence of actual
damages.  (Pl. Opp. at 24 (citing Dr. Tholen 2020 Dep. II at 79-85; Mrs. Tholen 2020
Dep. II at 31-37).)  Because the Court finds that Tholens may proceed with presumed
damages, it does not address the sufficiency of evidence related to actual damages.

damages are appropriate because their claim does not involve a matter of public concern and because Assist America acted with actual malice. (*Id.* at 27-30.)

Viewing the evidence in the light most favorable to the Tholens, the Court finds that the Statements could reasonably be understood to reflect poorly on Dr. Tholen's professional conduct as a medical doctor and therefore constitute defamation per se.[12] Indeed, the implication that Dr. Tholen's leg was amputated because he exercised poor judgment, improperly relied on human emotion, and ignored sound medical advice could reasonably be understood to irreparably harm his reputation as a medical doctor.[13] *High v. Supreme Lodge*, 7 N.W.2d 675, 678 (Minn. 1943) ("[T]he test for determining the actionable quality of words spoken concerning a professional man is whether they ascribe to him merely such want of information or good management as is compatible with general skill and care in his profession." (Internal quotation marks and citation omitted)).

The Court also finds that the Tholens have presented sufficient evidence to create a factual dispute over whether Assist America acted with actual malice when it wrote and

---

[12]    Because the Court finds that the Statements relate to Dr. Tholen's professional conduct as a medical doctor, the Court need not address whether defamation per se is limited to false accusations of committing a crime and false statements about a person's business, trade, or professional conduct.

[13]    This is particularly true for a surgeon whose sound judgment and proper adherence to medical protocol in high stress situations can mean the difference between life and death.

published the Case Study.[14]  Actual malice applies to a "defendant [who] acted with

knowledge that [a] publication was false or with reckless disregard of whether it was

false or not." *Chafoulias*, 668 N.W.2d at 654.  As discussed above, the record clearly

reflects that one or more of the Statements is false.  No less, Assist America argues that it

did not act with "reckless disregard" on whether information in the Case Study was false

because "the details were informed by evidence available in Assist America's case notes

and other sources." (Def. Memo. at 23.)  Assist America contends that the Tholens'

"disagreement on how [ ] some of those details were included in the Case Study only

demonstrates some disagreement on interpreting the interactions and events surrounding

Dr. Tholen's accident." (*Id.*)

The Court disagrees.  For example, Dr. Tholen's treating doctor in Mexico either

did or did not recommend surgery; Dr. Tholen either was or was not advised against

travel; Mrs. Tholen either did or did not inform Assist America that Dr. Tholen's leg was

amputated due to loss of circulation during travel.  These are not details open to

interpretation.  They are events that either happened or not.  It is for the jury to determine

whether Assist America acted with knowledge of falsity or reckless disregard when it

printed Statements wholly or in part contradicted by the record.[15]  At this stage, the Court

---

[14]    As discussed above, it is within the province of the jury to determine whether the
Statements are false and defamatory.  Upon such a finding, it is also for the jury to
determine whether Assist America acted with actual malice.

[15]    Because the Court finds sufficient evidence to create a genuine factual dispute on
whether Assist America acted with actual malice, the Court need not address whether the
Tholens are public figures, or the matter is one of public concern.

finds sufficient evidence for the Tholens to defeat summary judgment on a theory of presumed damages.

For similar reasons, the Court also finds that it is within the province of the jury to determine whether punitive damages are appropriate.  Minnesota law permits punitive damages "upon clear and convincing evidence" that a defendant acted with deliberate disregard for the rights or safety of others.  Minn. Stat. § 549.20(1)(a).  Deliberate disregard is shown when the actor "has knowledge of facts or intentionally disregards facts that create a high degree of probability of injury to the rights or safety of others," yet deliberately proceeds "to act in conscious or intentional disregard" of this likelihood or "to act with indifference" to it.  *Id.*, subd. 1(b).

Assist America argues that it did not act with conscious or intentional disregard for the Tholens' rights because the Case Study did not include identifying information and because it was not false or defamatory.  (Def. Memo. at 24; *see also* Reply at 11-12.) It insists that punitive damages are not warranted because the Case Study was a learning tool loosely based on Dr. Tholen's accident that did not attack or insult the Tholens or their reputations.  (Reply at 12.)  As discussed above, genuine disputes of material fact preclude summary judgment on all of the reasons underlying Assist America's argument that punitive damages are not warranted.  If a jury finds Assist America liable for defamation, the Court finds sufficient evidence to also create a triable issue on whether Assist America acted with deliberate disregard for the Tholens' rights when it published Statements wholly or in part contradicted by the record that implied Dr. Tholen's leg was amputated because he acted in haste and ignored sound medical advice.

## CONCLUSION

The Court finds that the Tholens have presented sufficient evidence to create triable issues on whether a reasonable reader could identify them as the subjects of the Case Study, whether the Case Study includes Statements understood to be false and defamatory, whether they suffered reputational damages, and whether punitive damages are warranted.  Therefore, the Court denies Assist America's motion for summary judgment.

## ORDER

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant Assist America's Motion for Summary Judgment (Doc. No. [52]) is **DENIED.**

Dated:  March 24, 2021                       s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             United States District Judge